UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


LYMAN MINUGH,

               Plaintiff,

      v.

MININAIL, LLC, a foreign limited liability
company, and MIDWAY VISHIONS, INC. a
foreign business corporation,

               Defendants.

Case No. 3:23-cv-01681-YY

OPINION AND ORDER


YOU, Magistrate Judge.

      Plaintiff Lyman Minugh brought this suit after he was severely burned using an electronic vaporizer; his left index finger burned to the bone and had to be amputated, and he received a skin graft for a third-degree burn on his left foot. Plaintiff asserts claims for strict product liability, breach of implied warranty of merchantability, breach of implied warranty for fitness for a particular purpose, and breach of express warranty against defendants Mininail, LLC—the manufacturer of the "MiniNail"[1] vaporizer—and Midway Vishions, Inc.

---

[1] For clarity and ease of reference, this Opinion and Order refers to the defendant company as "Mininail" and the vaporizer device at issue as the "MiniNail."

("Midway")—the owner of the retail store where plaintiff alleges he bought the MiniNail.[2]
Currently pending is Midway's motion for summary judgment, which asserts that all of
plaintiff's claims against it fail. For the reasons that follow, Midway's motion is granted as to
plaintiff's various breach of warranty claims and otherwise denied.

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment
if the movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." The party moving for summary judgment bears the
initial responsibility of informing the court of the basis for the motion and identifying portions of
the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate
the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings"
and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (citing
Fed. R. Civ. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only
determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047,
1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are
resolved against the moving parties and inferences are drawn in the light most favorable to the
non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

---

[2] Plaintiff also asserts a negligence claim against defendant Mininail; neither that claim nor any
other claim asserted against Mininail is discussed here because Mininail has not filed a
dispositive motion.

## II.    Background

The following facts are, unless otherwise noted, undisputed. Midway owns a "smoke shop retail store" located in San Diego, California, that sells "tobacco, cigars, tobacco vaporizers like electronic cigarettes and pipes," and "water pipes" or bongs.[3] Midway does not sell products containing cannabis, but some of the products it sells can be used to consume it.[4]

The MiniNail is an electronic vaporizing kit that is designed to "fit a water pipe," according to its user manual.[5] The kit includes a coiled heating element that connects to a "MiniNail Controller" box used to set a particular temperature; the default temperature is 600 degrees Fahrenheit, and "safe operating temperatures" for the device "are between 200ºF and 600ºF."[6] The device can get even hotter, although the manual warns users not to exceed 1100 degrees Fahrenheit.[7] The "Nail Accessory" connects the heating coil to a water pipe.[8] Essentially this "nail," or "banger," "bucket," or "bowl" as it is sometimes referred to, acts as platform for whatever product is to be heated up and vaporized, and then allows the vapor to travel through the water pipe and, presumably, to the user.[9] A photo near the end of the manual shows a person shrouded in vapor "dabbing" or "capping" a rainbow-hued nail; another photo in the front of the

---

[3] Pl. Supp. Br., Ex. 3 (Midway 30(b)(6) Dep.) 17:13–20, ECF 34-1; *see also* Brooks Decl., Ex. 3 (Minugh Dep.) 55:3–4, ECF 26-4.

[4] Midway 30(b)(b) Dep. 17:21–23, 24:15–22, ECF 34-1.

[5] Piekarski Decl., Ex. B ("MiniNail User Manual") at 6, ECF 24-2.

[6] *Id.* at 4, 7, 8.

[7] *Id.* at 3.

[8] *Id.* at 6 ("⚠ The heating element must be securely attached to the nail and the nail securely attached to the water pipe."); *see also* Minugh Dep. 126:22–127:11, ECF 26-4.

[9] *See* Minugh Dep. 126:12–127:11, ECF 26-4; Piekarski Decl., Ex. B (Minugh Dep) 155:8–13, ECF 24-1.

manual shows a glass bong connected to the MiniNail and heating coil, with a braided cord extending towards the "Controller" box, set to "559."[10]

The manual contains several warnings regarding the "extreme temperatures" that the coil can reach.[11] But the manual is not specific as to what products are meant to be "loaded" or used while operating the MiniNail.[12] The manual states that users should "turn on, adjust temperature to desired level & enjoy."[13] According to Mininail's corporate designee (and the designer of the device), the MiniNail was intended to "[h]eat a dish through vaporized cannabis concentrates," though the company "can't market directly to cannabis users due to federal law."[14] Nothing in the materials accompanying the device mentions cannabis or directs users what to put, or what not to put, in the vaporizer.[15]

Midway bought the vaporizer from Mininail after hearing the company's "sales pitch" about using cannabis in the vaporizer at the "CHAMPS Trade Show" in Las Vegas, which Midway described as an event featuring "everything marijuana related for a retail store."[16] Plaintiff, however, had other ideas. Sometime around the fall of 2020, plaintiff had used an "e-nail" device similar to the MiniNail to vaporize fentanyl and had read "online" about "some guy who owned a smoke shop [who] was putting fentanyl in his e-nail juice, and someone had died purchasing the e-nail juice from this guy . . . [b]ecause they overdosed on the fentanyl. . . . [The article] was talking about . . . why this person had overdosed because . . . the hotter the

---

[10] MiniNail User Manual at 2, 9, ECF 24-2; *see also id.* at 4 (describing the "Cap/Dabber Accessory").
[11] *Id.* at 3.
[12] Pl. Supp. Br., Ex. 1 (Mininail 30(b)(6) Dep.) 23:5–24:9, ECF 34-1.
[13] MiniNail User Manual at 5, ECF 24-2 (some capitalization modified).
[14] Mininail 30(b)(6) Dep. 17:2–18, ECF 34-1.
[15] *Id.* at 23:18–24:9.
[16] Midway 30(b)(6) Dep. 24:5–25:21, ECF 34-1.

transmitter was, . . . the more it releases the fentanyl[.]"[17]  Plaintiff had, at that point, been vaporizing fentanyl for "like five months," and had "seen videos online" about the MiniNail and visited online forums where "a bunch of [people] would talk about smoking fentanyl out of it[.]"[18] Plaintiff went to several "smoke shops" around San Diego (where he was living at the time) trying to buy a MiniNail or similar e-nail vaporizer, and finally found one for a good price at the Midway store.[19]

Plaintiff testified that he bought the MiniNail at the Midway store in November of 2020 using a combination of cash and a debit card.[20] Midway, for its part, denies that plaintiff bought the MiniNail at its store because it cannot find a corresponding transaction or combination of transactions in its records that could account for the MiniNail's $300 retail sales price. *See* Midway Mot. Summ. J. 2–3, ECF 23. Plaintiff describes a short interaction with an alleged Midway employee before he purchased the MiniNail in which the employee "didn't know much about the device" other than the price, described that Midway "[sold] out of them all the time," and suggested a quartz bowl for a smoother taste.[21] But plaintiff and the employee never talked specifically about how to use the MiniNail, nor did plaintiff tell the employee that he planned to use it to vaporize fentanyl.[22]

In any event, after plaintiff acquired the MiniNail, he eventually made his way to Portland, and began using the device as planned. Plaintiff described that "[e]very time I was home I would use it,"[23] i.e., multiple times a day: "When I woke up I probably used it, and when

---

[17] Minugh Dep. 151:12–153:3, ECF 26-4.
[18] *Id.* at 50:19–23, 156:3–16, ECF 24-1; *id.* at 54:20–22, ECF 26-4.
[19] *Id.* at 153:4–154:2, ECF 26-4.
[20] *Id.* at 56:3–14.
[21] *Id.* at 56:17–57:14, 154:20–155:13.
[22] *Id.* at 155:14–25.
[23] *Id.* at 57:21.

I left the house, and then probably when I got home I used it. And then, . . . throughout the night I used it until I went to sleep. Every time I thought about taking a hit of fentanyl I probably used it if I was at home."[24] Plaintiff's preferred temperature for vaporizing fentanyl was 960 degrees, although sometimes he "set it to 750 degrees" and "sometimes . . . to 800[.]"[25]

Approximately a year later, in October of 2021, plaintiff was at home in Portland in his "fifth wheel RV." He was seated on top of the single step separating the raised bedroom from the lower area of the living room, bathroom, and kitchen, and "was getting ready to smoke" fentanyl—the only drug he used in the vaporizer—and "had the bong and e-nail next to" him.[26] The control box was behind him on the bedroom floor and plugged in; plaintiff sat down because "[t]hat's where [the MiniNail] was plugged in at the time."[27] Then, plaintiff thought he heard a car, possibly his girlfriend's, coming down the gravel driveway.[28] He "got up really fast" and "fell over."[29] Plaintiff's testimony on what caused him to trip is not definitive. He said he "ha[s] no idea" what he tripped on, but also that it could have been his own feet or perhaps "some cords that were on the ground right there."[30] Somehow, plaintiff tripped and fell, and the cord to the MiniNail "must have got pulled or something."[31] The bong tipped over and the "nail" fell out, landing on plaintiff's left shoe.[32] It "instantly started to sink" and plaintiff tried but could not kick the nail off.[33] When the nail hit the skin of plaintiff's foot, he "yelled [and] . . . blacked

---

[24] *Id.* at 58:18–25, ECF 24-1.
[25] *Id.* at 65:18–25, ECF 26-4.
[26] *Id.* at 60:20–61:1, 67:4–13, ECF 24-1.
[27] *Id.* at 85:16–86:16.
[28] *Id.* at 60:18–19, 87:7–15.
[29] *Id.* at 87:16–18.
[30] *Id.* at 67:14–18, 91:1–3.
[31] *Id.* at 67:20–22.
[32] *Id.* at 67:21–25.
[33] *Id.* at 68:1–4.

out."[34] He woke up, crying, and "grabbed the thing off [his] foot," thinking that he did not want it to burn the floor.[35] Plaintiff passed out again.[36]

He woke a second time, went to the kitchen and "grabbed some milk and some Oreos," and ate them while he walked around asking, "Why me? Why me?," though he did not notice yet that his hand was burned.[37] Plaintiff sat down on the bed, "grabbed the bong, [and] took a hit out of it."[38] He then apparently passed out for a third time, "rolled over on top" of the heating coil or nail and burned his left buttocks and chest.[39] When plaintiff woke up again, his sweater was "stuck to [his] chest . . . [and] back."[40] Plaintiff called his girlfriend for help and told her had "burnt [himself] super bad."[41] When plaintiff's girlfriend arrived, she found plaintiff's sweater and shorts were "soaked in blood from the burns," although the burn on his foot was severe enough that it was immediately "cauterized" and had damaged "all the nerve endings and feeling in [plaintiff's] entire foot" so he "couldn't feel anything down there."[42] The extent of plaintiff's injuries from the device are not supported by any evidence in the current record, but as mentioned above, plaintiff alleges in the complaint that his left index finger suffered a "[d]eep fourth-degree burn with loss and exposure of bone and necrotic tendon" and had to be amputated, his left foot suffered a third-degree burn that required a skin graft, and he suffered

---

[34] *Id.* 68:5–7.
[35] *Id.* at 68:7–13.
[36] *Id.* 68:14.
[37] *Id.* at 68:14–20.
[38] *Id.* at 68:21–22.
[39] *Id.* at 68:22–69:2.
[40] *Id.*
[41] *Id.* at 69:7–9.
[42] *Id.* at 69:17–21, 99:12–20.

damage to other "muscles, ligaments, tendons, nerves and other soft tissue" on his left hand, left foot, left buttock, and chest.[43]

Plaintiff initially filed suit in state court, and defendant Mininail removed the case to this court based on diversity jurisdiction in November of 2023. Not. Removal 1, ECF 1; Compl., ECF 1-1. Both defendants immediately answered the complaint, and the parties engaged in discovery without judicial intervention for nearly a year. Plaintiff then failed to appear for two noticed depositions and, after a hearing, the court ordered plaintiff to appear for a deposition on October 16, 2024. Order (Oct. 9, 2024), ECF 21. Thereafter, Midway moved for summary judgment on all of plaintiff's claims against it. ECF 23. After oral argument on the motion, plaintiff and Midway submitted, at the court's request, supplemental briefing regarding Midway's so-called "misuse" or "abnormal use" defense asserted against plaintiff's strict product liability claim. Midway's motion is now ripe for decision.

## III.    Discussion

As mentioned, Midway moves for summary judgment on all the claims plaintiff brings against it. As a threshold issue, Midway first asserts that plaintiff cannot prove he bought the MiniNail vaporizer from Midway's store in San Diego, and thus claims plaintiff cannot succeed on any product liability or breach of warranty claim. Mot. Summ. J. 2–3, ECF 23. Second, Midway asserts that plaintiff's injuries were caused by plaintiff's misuse of the device and not by any defect in the product. *Id.* at 3. It is undisputed that plaintiff had been using the MiniNail for approximately a year exclusively to vaporize fentanyl at high temperatures, often several times a

---

[43] Compl. ¶ 14, ECF 1-1. It should be noted that the extent of plaintiff's injuries is not at issue in Midway's currently pending motion for summary judgment, and the allegations here are provided only for context. Nothing in this Opinion and Order is intended to suggest, one way or another, any ruling about the legal or evidentiary sufficiency of plaintiff's claims for damages.

day. This "patently unforeseeable" use, Midway asserts, should bar plaintiff's recovery on any strict product liability claim against it in part because plaintiff has not produced any evidence that Midway "sold a product that was intended to be used to ingest illegal and controlled substances[.]" Midway Supp. Resp. 2–3, ECF 36. Finally, Midway asserts that plaintiff's breach of warranty claims fail because they are without merit or otherwise not supported by evidence in the record. Mot. Summ. J. 12–14, ECF 23. Each of these arguments is addressed in turn.

### A.    Purchase from Midway

Midway first asserts that plaintiff does not have sufficient evidence to establish that he actually purchased the MiniNail from its store. Mot. Summ. J. 11, ECF 23. Because all of plaintiff's claims against Midway—strict products liability, breach of the implied warranties of merchantability and fitness for a particular purpose, and breach of express warranty—require plaintiff to establish that Midway was the "seller" of the vaporizer, that issue is addressed first. *See* O.R.S. 30.900 (providing that an action for products liability can be brought against "a manufacturer, distributor, seller or lessor of a product"); O.R.S. 72.1020 (providing that Oregon's version of the Uniform Commercial Code applies to "transactions in goods").[44]

Plaintiff testified that he purchased the MiniNail from Midway using a combination of cash and a debit card.[45] Plaintiff's bank statement shows a debit card purchase for $131.00 from "Vishions Smoke Shop" in San Diego on November 26, 2020, and a $700 cash withdrawal from an ATM on November 25, 2020.[46] Plaintiff also testified about a conversation he claims he had with a Midway employee when he purchased the device.[47] Midway has produced several

---

[44] Plaintiff does not dispute that a ruling in Midway's favor on the "purchase" issue would be dispositive of all of plaintiff's claims. *See* Resp. 7–11, ECF 26.
[45] Minugh Dep. 56:3–12, ECF 26-4.
[46] Brooks Decl., Ex. 4 at 2, ECF 26-5.
[47] *See, e.g.*, Minugh Dep. 56:17–57:14, 154:20–155:13, ECF 24-1.

business records for the transactions it closed in the days surrounding November 26, 2020. There are no records reflecting a debit card charge for $131.00; there is one transaction that Midway points out was $131.97 on November 26, 2020, at 11:03 a.m.[48] There are no corresponding cash transactions around that time that could add up with the $131.97 to equal the $300 purchase price that Midway asserts it charged for the MiniNail at that time.[49]

Plaintiff's evidence, however, is sufficient to create a question of fact as to whether he purchased the vaporizer from Midway; it is up to a jury to weigh plaintiff's evidence against Midway's business records and decide whom to believe. Thus, Midway is not entitled to summary judgment on this ground.

### B.    Products Liability—Misuse or Abnormal Use Defense

Midway asserts that "plaintiff's own fault was the cause-in-fact of his injuries, not a product defect" because he misused use the MiniNail to vaporize fentanyl. Mot. Summ. J. 11, ECF 23. According to Midway, this "patently unforeseeable" and abnormal use of the vaporizer should bar plaintiff's recovery on a strict products liability claim against it. Midway Supp. Resp. 2–3, ECF 36; *see also* Reply 5, ECF 27 (asserting that abnormal use of a product is a defense to strict product liability).

Under O.R.S. 30.920, a seller or manufacturer of a product "is liable for injuries caused to the product's user or to a third party if the plaintiff shows that the product is both defective and unreasonably dangerous." *Purdy v. Deere & Co.*, 311 Or. App. 244, 247 (2021). A plaintiff must establish the following for a product liability claim:

> (1) the sale or leasing of a product by one engaged in the business of selling or leasing such products;

---

[48] Guirguis Decl., Ex. E at 3, ECF 25-2.
[49] Guirguis Decl. ¶¶ 6–9, ECF 25.

> (2) a product that was expected to, and did, reach the user or consumer without substantial change in condition;
> (3) a product that, when sold, was in a defective condition unreasonably dangerous to the user or consumer;
> (4) injury to the user or consumer, or damage to his or her property;
> (5) that was caused by the product's defective condition.

*Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1317 (D. Or. 2016) (quoting *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 77 n.15 (2001)).

Is a "long-established principle" of Oregon law "that a plaintiff's incidental carelessness or negligent failure to discover or guard against a product defect is not an appropriate defense to that plaintiff's products liability action for injuries suffered because of the product defect." *Hernandez v. Barbo Mach. Co.*, 327 Or. 99, 109 (1998) (citing *Findlay v. Copeland Lumber Co.*, 265 Or. 300, 303, 305 (1973)). "Other forms of negligent conduct by a plaintiff, such as unreasonable misuse of the product, or unreasonable use despite knowledge of a dangerous defect in the product and awareness of the risk posed by that defect, are defenses to a strict products liability action." *Id.*

The "misuse" or "abnormal use" defense is based on section 402A of the Restatement (Second) of Torts, Comment h, "which provides that the seller is not liable if the product is safe for normal handling and consumption, and the injury results from abnormal use." *Findlay*, 265 Or. at 304.[50] Put another way, "[a] manufacturer of products is required to protect against all reasonably foreseeable uses of the product. A misuse is one which the manufacturer could not reasonably foresee." *Lakin v. Senco Prods., Inc.*, 144 Or. App. 52, 66 (1996), *aff'd*, 329 Or. 62 (1999) (concluding trial court did not err in giving the plaintiff's special requested instruction

---

[50] *See also* O.R.S. 30.9020(3) ("It is the intent of the [Oregon Legislature] that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965).").

regarding the misuse defense). To establish misuse, the defendant must show that the plaintiff "used or handled the product in a manner so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it and, therefore, a manufacturer could not have foreseen the use." *Id.*[51] "Misuse is normally a jury question unless 'reasonable minds could not differ, which instance the case would be at an end.' " *Rapant v. Grizzly Indus., Inc.*, No. 6:22-cv-01200-AA, 2023 WL 6930867, at *4 (D. Or. Oct. 19, 2023) (quoting *Newman v. Utility Trailer & Equip. Co., Inc.*, 278 Or. 395, 399 (1977)).

Midway asserts that "[p]laintiff offers no evidence that Midway sold a product that was intended to be used to ingest illegal and controlled substances" and thus plaintiff's use should be deemed unforeseeable as a matter of law. But the evidence regarding the MiniNail's intended use is more mixed than Midway posits and is sufficient to create a jury question as to foreseeability.

MiniNail's designer and the company's CEO testified that he intended for the product to vaporize cannabis concentrates.[52] And Midway knew that the MiniNail was intended to be used to vaporize cannabis—that is what representatives from Mininail told Midway at the CHAMPS trade show for cannabis retail where Midway first bought the MiniNail for resale in its store.[53]

The user manual accompanying the vaporizer is not as specific. It never mentions cannabis or even the word "vaporize" in any form, and apart from instructions about how to assemble the kit and set the temperature, the manual is silent on what should happen after the coil heats up or what exactly MiniNail users should expect to "enjoy," as the manual vaguely

---

[51] The Restatement also provides some examples of mis- or abnormal use: "If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable." Restatement (Second) of Torts, § 402A, cmt. h (1965).

[52] Mininail 30(b)(6) Dep. 17:9–18, ECF 34-1.

[53] Midway 30(b)(6) Dep. 24:5–25:24, ECF 34-1.

describes.[54] Mininail's CEO testified that it "do[es] not give instructions on" when the user should insert the product to vaporize, and does not provide any instructions to users about what "they can put in it and what they can't put in it" because "[t]hat is [the users'] discretion."[55]

The manual is perhaps coy about the MiniNail's intended use because the company "can't market directly to cannabis users due to federal law."[56] Although a number of states, including Oregon, have legalized cannabis use for recreational purposes, it is still a Schedule I controlled substance under the federal Controlled Substances Act. *See* 21 U.S.C. § 812; *see also State v. Heaston*, 308 Or. App. 694, 697–98 (2021) ("In 2014, Oregon voters approved Ballot Measure 91, which legalized the production and sale of marijuana for recreational use under state law, but the manufacture, distribution, dispensation, and possession of marijuana are illegal under federal law, even when authorized by state law.") (simplified); *In re Kojima*, No. 8:23-cv-00167-RGK, 2023 WL 4602623, at *3 (C.D. Cal. July 17, 2023) ("Despite the recent trend of cannabis legalization among states, cannabis remains a Schedule I controlled substance under the CSA."). Mininail apparently sold the vaporizer "to each of the 50 states," without regard for whether the use of cannabis was prohibited in a particular state.[57]

Given the vagaries in the written materials accompanying the MiniNail and the "wink-and-a-nod" manner in which it was marketed, using the MiniNail to vaporize a controlled substance, including one other than cannabis, is not a "patently unforeseeable" use. Arguably, one should reasonably expect that a device meant to vaporize one controlled substance might be used to do the same to a different controlled substance. *See LeBouef v. Goodyear Tire & Rubber*

---

[54] *See* MiniNail User Manual at 5, ECF 24-2.
[55] Mininail 30(b)(6) Dep. 23:5–24:9, ECF 34-1.
[56] *Id.* at 17:2–9.
[57] Mininail 30(b)(6) Dep. 35:10–19, ECF 34-1.

*Co.*, 623 F. 2d 985, 989 (5th Cir. 1980) (rejecting the defendant's argument that driving in excess of 100 miles per hour was not a "misuse" of a sports car, writing that "[i]t would be blinking reality . . . to hold that [the defendant] could not reasonably have expected purchasers of any automobile, much less one equipped and marketed as was [this car], to transgress our nation's speeding laws periodically"). Moreover, Mininail's CEO and designer of the vaporizer testified that it was in the user's "discretion" when it came to what types of material to vaporize, and Midway has not pointed to any evidence or legal authority to support the conclusion that plaintiff's choice of vaporizing medium is so "patently unforeseeable" that the question regarding plaintiff's use should be taken from the jury at summary judgment.

Midway's reliance on the terms of service on the Mininail website—which state that the vaporizer was "designed, manufactured, and sold as hot air extraction devices used and intended to use in the fields of aromatherapy"—does not change this analysis. *See* Midway Supp. Resp. 2, ECF 36. For one thing, there is no evidence that plaintiff bought the vaporizer through Mininail's website or was otherwise aware of the terms of service before purchasing the vaporizer and Midway has not explained on what legal basis those online terms should control.

To the extent Midway seeks to establish misuse based on the theory that plaintiff "ignored the device safety information" when he "set the device on the floor and allowed it to fall over onto him," that too is insufficient to warrant summary judgment in Midway's favor. *See* Mot. Summ. J. 8, 12, ECF 23 (some capitalization modified). The manual warns users that the coil "heats to extreme temperatures," and users should "not touch while in operation," "keep all flammable material away from coil," and "watch loose cables that could be snagged," but Midway does not explain how these warnings or any other evidence in the record establish that setting the MiniNail on the floor was so obviously unforeseeable to warrant summary judgment

on Midway's misuse defense. *See Hernandez*, 327 Or. at 109 (explaining that "incidental carelessness . . . is not an appropriate defense to [a] plaintiff's products liability action").

Thus, defendant's motion for summary judgment on its defense against plaintiff's strict products liability claim—which essentially seeks a ruling that plaintiff's use of the MiniNail was "patently unforeseeable" and thus cannot succeed—is denied.

### C.    Breach of Warranty Claims

Midway has also moved for summary judgment on plaintiff's three other claims against it: breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and breach of express warranty. *See* Mot. Summ. J. 12–14, ECF 23. In the supplemental briefing, neither party further addressed the warranty of merchantability or express warranty claims. *See* Resp. 15–16, ECF 26; Reply 6, ECF 27. As explained more fully below, all of plaintiff's breach of warranty claims against Midway fail.

### 1.    Implied Warranty of Merchantability

O.R.S. 72.3140, which is contained in Oregon's version of the Uniform Commercial Code ("UCC"), requires that goods be "merchantable," meaning that, among things, they are "fit for the ordinary purposes for which such goods are used[.]" The question whether the MiniNail was fit for its ordinary purpose essentially asks whether it was capable of doing what it was supposed to. *See Carpenter v. Land O'Lakes, Inc.*, 976 F. Supp. 968, 972–73 (D. Or. 1997), *on reconsideration in part on other grounds,* 985 F. Supp. 1249 (D. Or. 1997) ("The ordinary purpose of feed sold by [the defendant] is to nourish dairy cows without making them ill. The court finds that the moisture level of the feed caused the mold spores . . . and the mold in the feed caused the rumen acidosis episode in early June of 1993. Thus, the court concludes that the quality of the feed was in breach of the implied warranty of merchantability under ORS

72.3140."). As explained above, plaintiff bought the MiniNail to use as a vaporizer, and plaintiff testified that he was able to successfully use the MiniNail in that capacity numerous times, several times a day apparently for approximately a year.[58] The MiniNail, in other words, did what plaintiff wanted it to do, and thus plaintiff's claim for breach of the implied warranty of merchantability against Midway is subject to summary judgment. *Cf. Pac. Botanicals, LLC v. Sego's Herb Farm, LLC*, No. 1:15-cv-00407-CL, 2016 WL 11187249, at *8 (D. Or. Dec. 8, 2016), *report and recommendation adopted,* No. 1:15-cv-00407-CL, 2017 WL 1536432 (D. Or. Apr. 26, 2017) (finding that seller provided "three orders of DDE–contaminated ginseng; food containing DDE residue may not be sold in the United States . . . . [and] a reasonable jury could find that ginseng's ordinary purposes is to be purchased for consumption by buyers in the United States and that DDE contamination therefore rendered the product unfit for this purpose, breaching the implied warranty of merchantability").

### 2.    Implied Warranty for a Particular Purpose

O.R.S. 72.3150 provides that "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." "The following conditions are necessary to create a warranty of fitness for a particular purpose: (1) the seller must have a reason to know the buyer's particular purpose; (2) the seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer must, in fact, rely upon the seller's skill or judgment." *Hill Meat Co. v. Sioux-Preme Packing Co.*, No. 2:08-cv-01062-SU, 2009 WL 1346606, at *5 (D. Or. May 13, 2009) (citing O.R.S. 72.3150; *Swan Island Sheet*

---

[58] *See* Minugh Dep. 50:3–23, 58:15–25, ECF 24-1; Guirguis Decl., Ex. D at 3, ECF 25-1.

*Metal Works, Inc. v. Troy's Custom Smoking Co., Inc.,* 49 Or. App. 469, 473 (1980)) (internal

citation omitted).

This claim too is subject to summary judgment in Midway's favor. When asked about his

interaction with the Midway employee who allegedly sold him the MiniNail, plaintiff said the

employee:

> really didn't know much about the device. . . . I asked him how
> much the price was. And I know that I was like taken aback about
> how much it was. . . . I remember the salesman had big, long
> dreads, he was white. And that --- I mean, he was . . . rude. . . . I
> think he said that it came with a quartz, like, bowl . . . and so that it
> was a lot smoother, it wasn't as harsh when you smoked out of it. I
> think that's all he told me. Yeah, that's all he told me.[59]

Later, counsel again asked what the Midway employee and plaintiff had discussed about the

MiniNail and plaintiff's intended use, and plaintiff responded:

> [I] asked him about it, like I said, he was kind of a jerk. He was
> really short with me and he acted like he had better things to do.
> But he did . . . he like pretty much handed me the box to read it. So
> I did read the box, and then he told me that they sell out of them
> really quick. That they sell out of them all the time. . . . [H]e said
> that the quartz . . . was like the best flavor that you could get when
> you were smoking.[60]

In other words, plaintiff made an essentially "off-the-shelf" purchase in which he knew

what he wanted, and he did not make the employee aware of any particular need he had for the

vaporizer that would have required the employee to make some particular recommendation for

that purpose. *See Carpenter*, 976 F. Supp. at 973 (finding that the plaintiffs could not sustain a

claim for breach of the implied warranty for a particular purpose because they "purchased 'off

the shelf' dairy feed," "did not request any special formula for the feed," and testified that they

---

[59] Minugh Dep. 56:19–57:14, ECF 24-1.
[60] *Id.* at 154:23–155:7.

"signed the feed contract with [the defendant] because of the price"). As the comments to O.R.S. 72.3150 explain:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

O.R.S. 72.3150 cmt. 2. There is no evidence that plaintiff told anyone from Midway that he intended to use the device for anything other than its supposed used: personal electronic vaporizing.

"The existence of a warranty of fitness for a particular purpose depends in part on the comparative knowledge and skills of the parties," and "[t]here can be no justifiable reliance by a buyer possessing equal or superior knowledge or skill with respect to the product purchased by him." *Swan Island*, 49 Or. App. at 474. Here, plaintiff knew at least as much, if not more, than Midway's employee about the MiniNail and how he intended to use it. Before purchasing it, plaintiff learned how to use the device for his intended purpose by "[watching] videos online" and observing others.[61] At best, the employee "talked up" the MiniNail and said that Midway sold out of the units quickly, and provided basic information about the vaporizer such as how much it cost and how to achieve the best "taste," but there is nothing that suggests the employee used any skill or judgment in recommending the MiniNail to plaintiff to achieve some specific or particular use. *See Beam v. Cullett*, 48 Or. App. 47, 50 (1980) (finding no implied warranty for particular purpose in purchase of a truck from the defendant; the truck's engine was rebuilt prior

---

[61] Minugh Dep. 50:19–22, ECF 24-1; *id.* at 151:23–152:7, ECF 26-4.

to the purchase and the defendant "merely answered plaintiff's inquiries concerning the mechanic's work on the engine" and did not provide any "judgment in selecting the truck" or make an "offe[r] to fulfill [the plaintiff's] needs").

Midway is therefore entitled to summary judgment on plaintiff's claim for breach of the implied warranty for a particular purpose.

### 3.    Express Warranty

"To succeed on a claim for breach of express warranty, plaintiffs must show: (1) a warranty; (2) breach of that warranty; (3) notice to the warrantor of the breach; and (4) damages proximately caused by the breach." *Konoloff v. Safeco Ins. Co. of Am.*, No. 3:20-cv-01622-AR, 2022 WL 3648656, at *6 (D. Or. July 27, 2022) (simplified). Under O.R.S. 72.3130, express warranties by the seller are created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain[.]"

Plaintiff asserts that Midway breached an express warranty in "assuring that the product was safe for use as a personal electronic vaporizer." Resp. 6, ECF 26; *see also* Compl. ¶ 44, ECF 1-1 (alleging that Midway "made factual affirmations and promises relative to the safety of the [vaporizer] for consumer use"). But plaintiff does not identify any such specific promise by Midway; as laid out above, plaintiff testified that the employee "really didn't know much about the device" apart from the price and that Midway apparently "[sold] out of them really quick."[62] This type of commercial "puffery" does not create an express warranty. *See* O.R.S. 72.3130(2) ("[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."); *Jordan v. Paccar,*

---

[62] Minugh Dep. at 56:19–57:14, 154:23–155:7, ECF 24-1.

*Inc.*, 37 F.3d 1181, 1185 (6th Cir. 1994) (explaining that Ohio's version of the UCC "distinguishes between serious representations and commercial puffery").

According to plaintiff, the Midway employee also recommended the quartz "bowl" because it "was a lot smoother [and] wasn't as harsh when you smoked out of it."[63] But apart from a short exchange, plaintiff said the employee "was kind of a jerk. . . . [H]e like pretty much handed me the box to read it."[64] There is no evidence that plaintiff and the employee discussed at all how to operate the vaporizer, whether it was "safe" for vaporizing or had any particular safety features, or what types of products could be vaporized in it, and thus there is no basis for finding any "affirmation of fact" or "promise" necessary for an express warranty from Midway to arise. *See Miller v. Hubbard-Wray Co.*, 52 Or. App. 897, 901, *modified on other grounds,* 53 Or. App. 531 (1981) (ruling that seller's "representation that the baler was only two years old and had been used only one year is a statement of fact material to the bargain in view of plaintiff's express criterion that the baler be newer than his former machine"). Moreover, Midway's employee did not create an express warranty simply by delivering materials produced by defendant Mininail, the manufacturer of the vaporizer, when plaintiff purchased it. *See Hanson v. Signer Motors, Inc.*, 105 Or. App. 74, 77–78 (1990) (ruling that "warranty documents contain[ing] promises made by the manufacturer, not by the seller" did not create an express warranty by the seller).

Thus, plaintiff's breach of express warranty claim against Midway also fails.

//

//

---

[63] *Id.* 56:19–57:14.
[64] *Id.* 154:23–155:7.

**ORDER**

Defendant Midway Vishions, Inc.'s Motion for Summary Judgment (ECF 23) is granted as to plaintiff's claims against it for breach of the implied warranty of merchantability, breach of the implied warranty for a particular purpose, and for breach of express warranty, and is otherwise denied.

DATED September 29, 2025.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge
